UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ANNA VERBSKY SAGAMI, AND DESIGN-A-WAY PUBLICATIONS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> PALMER MARKETING ENT, LLC, AND CENTER COURT DIRECT, INC., <br><br> Defendants. | Case No. 3:10-cv-152 |

Expert Report of Jeffrey J. Cordray

Jeffrey J. Cordray
August 22, 2011

**CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**Qualifications**

1.     I am a Vice President at Christensen Associates, an economic research and consulting firm located in Madison, Wisconsin.  I frequently analyze damages in intellectual property matters, and I have lectured on the subject of intellectual property damages at the University of Wisconsin Law School.  A copy of my resume is included as Appendix A. Appendix B contains a list of cases in which I have testified within the preceding four years.  A list of the documents which I have received this case is included as Appendix C.  Christensen Associates is being compensated for my services in this case at the rate of $275 per hour.

**Introduction**

2.     I have been asked by counsel for defendants Palmer Marketing Ent, LLC (Palmer) and Center Court Direct, Inc. (Center Court) to review and comment on the Plaintiffs Sagami's and Design-A-Way Publications LLC's Disclosure and Itemization of Damages (Plaintiffs' Disclosure).[1]  I understand that Plaintiffs' Disclosure alleges to provide damages related to the claims found in the Complaint dated March 26, 2010, which includes allegations of copyright infringement and trade dress infringement.  I am not expressing any opinions with regard to liability.  My opinions are based on the information available to me at this time.  If additional evidence becomes available, I reserve the right to consider the affect, if any, the additional evidence may have on my opinions.

---

[1] Hereafter, where I use Design-A-Way, it will refer to the plaintiffs collectively.

Confidential—Attorneys' Eyes Only

**Summary of Opinions**

3.     It is my opinion that the Plaintiffs' Disclosure's claims regarding lost profits from lost bracelet and lost display sales are entirely speculative—they have been assumed. Therefore, lost profits are inappropriate as a measure of damages in this case. Similarly, Plaintiffs' Disclosure's claims of lost profits from lost ancillary sales and price erosion are entirely speculative and inappropriate as damages in this case. For example, the claimed lost ancillary sales are based on the underline assumed lost bracelet sales. Plaintiffs' Disclosure's unspecified claims for damages regarding Center Court's sales of its Twist brand products, convoyed sales to Twist products, and future lost profits are also wholly speculative and inappropriate as damages in this case. Finally, Design-A-Way's claimed price erosion ignores all market factors beyond the alleged infringement and ignores the law of demand.

4.     Regarding Plaintiffs' Disclosure's claims for disgorgement of Center Court's profits, I have calculated the appropriate deductions and show Center Court's profits in Figure 1. For its trade dress claims, Center Court's profits on all of the accused displays equals $5,093. For the copyright infringement claims, Center Court's profits on all of the accused bracelets equal $163,475. But, Center Court would have made the majority of the accused sales but for the alleged infringement.

5.     Plaintiffs' Disclosure does not appear to have any claims for damages directed solely at Palmer.[2]

---

[2] If plaintiffs put forth damages claims directed toward Palmer, I reserve the right to analyze those at that time.

**Background**

*Center Court and Palmer*

6.     Center Court designs and sells charms, among other products, to retail stores.  I understand that Center Court has sold more than fifty different jewelry products, including bracelets and earrings.[3]  The accused bracelets were sold under the Cliques brand name.  I understand that, in developing the Cliques bracelets, Center Court created at least eight designs, of which four were sold.[4]  I understand that the plaintiffs' allegations of trade dress infringement relate to the display used to exhibit the bracelets.

7.     All of the accused products were sold by Center Court through sales representatives.  Many of the accused sales were also sold through Palmer, which marketed the accused products to a variety of retail stores.  Figure 2 shows the breakdown of accused Cliques bracelets by Item by Sales Representative.[5]  I understand that the Cliques brand also had an anklet product which is not accused of copyright infringement.  The Cliques anklet was not included in marketing flyers, and I understand it had minimal sales.[6]  The Cliques brand did not include any necklaces or earrings.[7]

8.     I understand that products in this market tend to have relatively short life spans. Center Court sold the accused bracelets beginning in approximately March 2009, and they were

---

[3] Conversation with Steve Smous.
[4] Conversation with Steve Smous.  I understand that the four chosen designs were sold as 12 different item numbers (CLQ-01 to CLQ-12).  For example, see CC 00008.
[5] If any items are found to not infringe Design-A-Way's copyrights, then the revenue associated with that item should be excluded from any disgorgement of Center Court's profits.
[6] Conversation with Steve Smous.
[7] Conversation with Steve Smous.

discontinued in late 2009.[8]  Center Court was an established company with significant reputation at the time of the introduction of the Cliques product line.  In February 2009, *Gift Beat*, a trade publication, ranked Center Court's charms as the #4 Vendor/Line in the "$5 or Less, Cost" category.[9]  In 2008, Center Court introduced its Forever In My Heart locket, which became its most popular product.[10]  The Forever In My Heart locket received positive feedback in trade magazines.  For example, in March 2009, *Gift Beat* listed Center Court's Forever In My Heart locket as tied for the #7 rated jewelry Vendor/Line (#3 in the Midwest).[11]  I understand that the success of the Forever In My Heart locket helped Center Court in obtaining shelf space for its other products, including the accused Cliques bracelets.[12]  I understand that companies selling similar bracelets in competition with Design-A-Way included Gigi's and Fancy That.[13]  After discontinuing the Cliques bracelets, I understand that Center Court has sold bracelets under the brand names Twist and DaVinci.[14]

*Design-A-Way*

9.     Design-A-Way developed and began selling its SwarBali collection, which is now known as its Design-A-Way collection, in 2005.[15]  This collection includes bracelets, anklets,

---

[8] For example, see Sagami 0054.  The last date of sale for a Cliques bracelet was August 10, 2010.  However, Center Court discontinued marketing the Cliques products by 2010 and sales were minimal thereafter—totaling only $4,109 in sales since April 2010.  See Clq's.xls.
[9] CC 00060 to CC 00061.  Center Court was ranked #5 in the South and #3 in the Midwest.
[10] For example, see Sagami 0050.  Also, conversation with Steve Smous.
[11] CC 00052 to CC 00053.
[12] Conversation with Steve Smous.
[13] For examples, see CC 00034 to CC 00035, CC 00037, CC 00039 to CC 00041; and conversation with Steve Smous.
[14] For examples, see Sagami 0054, and Sagami 0065 to Sagami 0067.
[15] For examples, see the Plaintiffs' Disclosure, p. 3 and the Complaint, p. 4.

Confidential—Attorneys' Eyes Only                          5

necklaces, and earrings.[16]  I understand that Design-A-Way has sold approximately 110,000 pieces from its SwarBali collection.

**Putative Lost Profits from Lost Sales**

10.   Plaintiffs' Disclosure includes a claim of lost profits from lost bracelet and display sales.[17]  I understand that a plaintiff must show that, but for the defendant's actions, it would have made its claimed lost sales to be entitled to lost profits damages.  The entire lost profits computation in Plaintiffs' Disclosure is fundamentally flawed as shown by its own statement:

> It is assumed that but for the actions of the defendants, customers
> (primarily retail stores) would have purchased items from the
> SwarBali collection instead of the infringing Cliques products.[18]

This assumption is entirely speculative, as Plaintiffs' Disclosure does not include any analyses supporting its claim of lost sales.  Rather, it merely assumes that the plaintiffs would have made each and every accused sale made by Center Court.

11.   The plaintiffs failed to address each of the following in claiming lost sales:

- non-infringing alternatives known and available to the defendant at the time of the accused sales;

- other competitors in the market and what share of the accused sales, if any, the plaintiff would have made absent the alleged infringement;

---

[16] For example, see Complaint, Exhibit B.
[17] Plaintiffs' Disclosure, pp. 5-6.  It is unclear if the plaintiffs are claiming these as lost sales under copyright infringement claims, trade dress claims, or both.
[18] Plaintiffs' Disclosure, p. 5.

Confidential—Attorneys' Eyes Only                              6

- whether the alleged copyright or trade dress infringement was the basis of demand for customers' purchase of the accused products;

- the manufacturing and marketing capacity of the plaintiff—would the plaintiff have had the ability to make all the accused products and the ability to sell to all the customers the defendant reached;

- an accurate profit margin the plaintiff would have earned on the claimed lost sales.

12.   If Center Court would have sold alternative designs, then the plaintiffs' would not have made those sales.  I understand that Center Court did have alternative designs for both bracelets and displays available to it.  For example, I understand that Center Court only sold four of the at least eight bracelet designs it developed for the Cliques product line.[19]  Also, by September 2009, Center Court had decided to discontinue the Cliques product line and move forward with its Twist products.[20]  I understand that Center Court could have introduced the Twist products and/or other similar lines in March 2009.[21]  Center Court was also selling its DaVinci products by late 2010.[22]  Center Court also switched to purple frames as displays in the summer of 2009.[23]  These available alternatives indicate that Design-A-Way did not incur its assumed lost profits due to the alleged infringement in this case.

13.   Plaintiffs' Disclosure does not discuss the market for the accused products or alternative competitors in that market.  Design-A-Way was facing lower-priced competition prior

---

[19] Conversation with Steve Smous.
[20] For example, see Sagami 0054.
[21] Conversation with Steve Smous.
[22] For example, see Sagami 0065 to Sagami 0068.
[23] For example, see CC 00042 and conversation with Steve Smous.

to the introduction of the accused Cliques bracelets.[24]  I understand that at least Gigi's and Fancy

That sold similar magnetic clasp bracelets in competition with the accused products.[25]  Even if

Center Court would not have achieved all of the accused sales with an alternative design, a

portion of the remaining sales would have been made by these (or potentially other) competitors.

Plaintiffs' Disclosure does not include any consideration of who competes in the market with the

accused products or what share of that market is held by the plaintiffs.

      14.   Plaintiffs' Disclosure does not include any analysis of whether the alleged

infringement was the basis of demand for customers' purchases of the accused bracelets.

Plaintiffs' Disclosure does not contain any analysis of the role the alleged infringement (either

copyright or trade dress) played in making the accused sales.  Center Court had an established

market presence recognized by trade publications, and there were other competitors in the

marketplace.[26]

      15.   Plaintiffs' Disclosure's consideration of plaintiffs capacity to make the claimed

lost sales is limited to a single unsupported statement:

> Design-A-Way had available capacity and could acquire additional
> capacity at little cost if needed to produce the number of products
> sold by the defendants.[27]

Plaintiffs' Disclosure does not cite any documents or other support for this statement.  Nor does

it provide any evidence of the "little cost" necessary to acquire additional capacity.  These

expenses would need to be quantified and deducted by Design-A-Way.  Design-A-Way has not

---

[24] For example, see Sagami 0040.

[25] For examples, see CC 00034 to CC 00035, CC 00037, CC 00039 to CC 00041; and conversation with Steve Smous.

[26] I have not seen Design-A-Way or the SwarBali collection ranked by trade publications during the time period in which the Cliques product line was introduced.

[27] Plaintiffs' Disclosure, p. 5.

Confidential—Attorneys' Eyes Only                                  8

demonstrated that it had the manufacturing capacity to make the claimed lost sales, and its marketing capacity appears to be an even larger issue. I understand that a major factor in retail stores' willingness to purchase the accused bracelets from Center Court was its established reputation and the success of Center Court's Forever In My Heart locket. The past success of Center Court's Forever In My Heart locket was a significant factor in Center Court's marketing capacity—it allowed Center Court to reach customers that otherwise may not have carried the accused products. I have not seen evidence that Design-A-Way had a similar advantage in marketing its SwarBali collection during the period that the Cliques product line was introduced to Center Court's retail store customers, in particular at Hallmark.

16.   Plaintiffs' Disclosure also does not contain an accurate accounting of the profit margin it would have earned in making the claimed lost sales. Plaintiffs' Disclosure calculates a weighted-average gross margin, which includes consideration of material, labor, and commission expenses.[28] It does not appear that shipping expenses are included in measuring Design-A-Way's incremental profit margin. Plaintiffs' Disclosure then states, without any support, that Design-A-Way's overhead costs are primarily fixed in nature and assumes that incremental overhead expenses would total 5 percent of gross revenues.[29] It also does not deduct any expenses necessary to increase capacity. This is another example of the speculation that underlies the Plaintiffs' Disclosure's lost profits claims.

17.   Finally, Design-A-Way has again only assumed it would have made all of the accused display sales. There was no analysis of lost bracelet sales or of whether customers would have purchased displays from Design-A-Way at the same rate as the accused sales.

---

[28] Plaintiffs' Disclosure, p. 6.
[29] Plaintiffs' Disclosure, p. 6.

Confidential—Attorneys' Eyes Only                    9

Moreover, Design-A-Way's displays had an average price of $29.05 compared to an average price of $15.00 for Center Court's accused displays. The law of demand indicates that the almost doubling in price would have caused the quantity purchased to be less.

**Putative Lost Profits from Convoyed Sales**

18.   Plaintiffs' Disclosure contains a claim for lost profits from lost convoyed sales (specifically anklets, necklaces and earrings).[30]  A fundamental flaw in this claim is that, as discussed above, Design-A-Way has not established lost profits regarding the accused bracelets, without which its claim for lost convoyed sales is irrelevant.  Lost bracelet sales were "assumed."  Further, in establishing a claim for lost profits from lost convoyed sales, the convoyed sales need to derive their demand from the base product.  In this case, that is to say that the sales of bracelets were the basis of demand for sales of the other convoyed products. Typically, sales made together as a matter of convenience or business advantage are not compensable as lost convoyed sales.[31]  Plaintiffs' Disclosure includes no analysis showing that the copyrighted bracelets generated the alleged convoyed sales.  Further, Center Court did not even sell necklaces or earrings as part of its Cliques brand.  In fact, customers (retail stores) that purchased the accused Cliques bracelets did not (and could not) purchase ancillary necklaces or earrings of the Cliques design from Center Court—they did not exist.  The behavior of the customers that actually purchased the accused Cliques bracelets (not purchasing necklaces or earrings) indicates that lost convoyed sales would not be appropriate in this case.

---

[30] For example, see Plaintiffs' Disclosure, pp. 7-10.
[31] For example, see *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1550 (Fed. Cir. 1995).

Confidential—Attorneys' Eyes Only                                        10

**Putative Lost Profits from Price Erosion (Alleged Mitigation)**

19.   Plaintiffs' Disclosure includes a claim for lost profits from price erosion under the heading Damages Based on Plaintiffs' Lost Profits From Reduced Gross Margins as a Result of Attempted Mitigation.[32] This claim does not provide any accompanying support to establish lost profits from price erosion and is again entirely speculative.  Establishing a claim that infringing competition resulted in selling a lower priced product instead of a higher priced product requires the plaintiff to control for other market factors that may have influenced price.  In this case, there are at least two other competitors in the marketplace (in addition to non-accused products that Center Court could and did sell), and Plaintiffs' Disclosure includes no analysis of the affect these alternative competitors may have had on its price.  Plaintiffs' Disclosure also ignores the significant economic downturn during the period in which it sold its "Economy" products. Plaintiffs' Disclosure also acknowledges, but does not take into account, that Design-A-Way had been selling its SwarBali collection since 2005 and that the lengthy time on the market may have reduced demand for SwarBali products.[33]

20.   Another fundamental error in Plaintiffs' Disclosure's analysis of price erosion is a failure to account for the law of demand.[34]  The law of demand indicates that as prices increase, quantity demanded will decrease.  In this case, this means that if Design-A-Way is going to claim that it would have sold higher priced bracelets, it would have to reduce the quantity it would have sold to account for the reduced demand.[35]  Absent this quantity offset, the

---

[32] Plaintiffs' Disclosure, pp. 11-13.
[33] For example, see Plaintiffs' Disclosure, pp. 10-11.
[34] For example, see *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001).
[35] If there was a quality difference between Design-A-Way's original and "Economy" SwarBali products, then the original and Economy products may have occupied different market segments and not been directly substitutable for each other.  This would also make Plaintiffs' Disclosures' claims for lost profits from price erosion unfounded.

Confidential—Attorneys' Eyes Only                           11

calculations in Plaintiffs' Disclosure are clearly overstated and inappropriate to consider as damages in this case.

**Putative Lost Profits from Selling Derivatives of Infringing Items and Convoyed Sales of Derivatives of Infringing Items**

21.   Plaintiffs' Disclosure purports to claim an unspecified amount of lost profits from Center Court's sales of "derivative" items (Twist bracelets and displays) and convoyed sales from these derivative items.[36] However, Plaintiffs' Disclosure explicitly states that "the Twists bracelets and displays do not infringe on the similar SwarBali products."[37] Plaintiffs' Disclosure speculates without citing any evidence that it was only through the sale of the allegedly infringing Cliques products that Center Court was able to sell its Twist products.[38] However, Center Court had established relationships with retail stores and sales representatives prior to selling its Cliques products. In fact, if any product enhanced Center Court's relationship with retail stores and sales representatives, it was its Forever In My Heart locket. Plaintiffs' Disclosure goes on to speculate that it is "reasonable to assume" that, absent sales of Cliques products, Design-A-Way would have made sales of the non-infringing Twist products (and Twist convoyed sales) as well. No consideration is given to Center Court's ability to compete for sales with its non-infringing alternatives or other competitors in the market place such as Gigi's and Fancy That.

22.   It is my opinion that these purely speculative assumptions are without merit. The availability and sale of a non-infringing alternative is typically viewed as a limiting factor to a

---

[36] Plaintiffs' Disclosure, pp. 7, 10.
[37] Plaintiffs' Disclosure, p. 7.
[38] Plaintiffs' Disclosure, p. 7.

Confidential—Attorneys' Eyes Only                    12

plaintiff's ability to establish lost profits from lost sales—in complete contrast to Plaintiffs' Disclosure's view that these non-infringing alternatives represent additional sales assumed to be lost by Design-A-Way.

**Putative Damages Based on Plaintiffs' Future Lost Profits**

23.   Plaintiffs' Disclosure claims that Center Court's alleged infringement will cause Design-A-Way to have lower net profits in the future.[39]  Again, Plaintiffs' Disclosure provides no support for this statement.  In fact, Plaintiffs' Disclosure states that popularity of SwarBali items "peaked at <u>or before</u>" Center Court began selling the Cliques products.[40]  Plaintiffs' Disclosure goes on to state that "it is also possible that the popularity of the SwarBali bracelet has declined, as eventually experienced by most 'hot' products."[41]  Center Court decided to discontinue the accused Cliques product line by September 2009.  If the alleged copyrighted portion of the Cliques bracelets were demanded by consumers, then the discontinuation of the Cliques line would allow Design-A-Way to recoup its but-for position in the market.  The admitted expected decline in SwarBali item sales based on the length of time these items had been on the market and the discontinuation of the Cliques product line are contrary to Design-A-Way's claim of future lost profits.

---

[39] Plaintiffs' Disclosure, p. 10.  The amount of alleged future lost profits is not quantified.
[40] Plaintiffs' Disclosure, pp. 10-11, emphasis added.
[41] Plaintiffs' Disclosure, p. 11.

**Deductions from Center Court's Accused Cliques Bracelet Revenues**

24.    Plaintiff's Disclosure measures the sales on the entire Cliques product line (CLQ-01 through CLQ-12) as 90,010 units generating revenues of $495,422.[42]  I show the breakdown of these sales in Figure 2.  Figure 3 shows the incremental costs associated with making these sales.  Center Court purchased the beads and stringing for its Cliques bracelets for $2.50 per unit.[43]  Magnetic clasps for the Cliques bracelets were purchased at an average price of $0.14 per unit.[44]  Center Court added barcodes to the Cliques bracelets ($0.011 per unit) and bagged the bracelets ($0.015 per unit).[45]  Center Court also pays sales commissions to third-party sales representatives,[46] Palmer,[47] and Terry Roseberry,[48] Center Court's Sales Representative Manager.  Center Court's third-party sales representatives earn a commission of 15 percent on sales.[49]  Sales that go through Palmer are subject to an additional 3 percent commission.  For sales Mr. Roseberry makes acting as a sales representative, Center Court pays either 12 percent (if the sale also goes through Palmer) or 15 percent (all non-Palmer sales).  For sales made by other sales representatives, Mr. Roseberry receives a 6 percent commission.  The total incremental costs for sales of all Cliques bracelets equaled $331,947.[50]  See Figure 3.  The total

---

[42] Plaintiffs' Disclosure does not include an accounting of alleged "shipping revenues."  Plaintiffs' Disclosure, p. 3. However, I understand that Center Court personnel boxed the Cliques products prior to shipping, and Center Court paid third party shippers to transport products to customers—offsetting any revenues charged to customers for shipping the accused products.

[43] For examples, see RS00016 to RS00026.

[44] For examples, see RS00056 to RS00058.

[45] For examples, see CC 00048 to CC 00049.

[46] For examples, see CC 00001 to CC 00007 and CC 00009 to CC 00025.

[47] For example, see CC 00026 and conversation with Steve Smous.

[48] For example, see CC 00027 and conversation with Steve Smous.

[49] For examples, see CC 00001 to CC 00007 and CC 00009 to CC 00025.

[50] Center Court also purchased sheet metal (used in the magnetic clasp) and chipboard used in manufacturing and selling the accused Cliques products.  For examples, see CC 00046 to CC 00047.  However, I have not been able to measure these costs on a per unit basis, and it is possible that some expense would have been related to other products.  I have not deducted these expenses when calculating Center Court's incremental profit margin.  I have also not deducted any General and Administrative expenses.

incremental profits for all Cliques bracelet sales equaled $163,475. See Figure 4. This is an upper bound on Center Court's incremental profit attributable to the alleged copyright infringement. Center Court could have made the majority, if not all, of the accused sales through alternative designs (unsold Cliques designs or its Twist Products).[51]

**Deductions from Center Court's Accused Display Revenues**

25.   I understand that Design-A-Way's allegations of trade dress infringement relate to the picture frame displays occasionally sold for the Cliques collection.[52] Design-A-Way has stated that "[t]he wide variety of methods for displaying jewelry provides the Defendants multiple alternative methods of displaying the Clique line."[53] In fact, during the summer of 2009, I understand that Center Court switched to using purple picture frames as display units instead of the accused cream-colored frames.[54] Moreover, the accused frame was an off-the-shelf product from Hobby Lobby.[55]

26.   Design-A-Way has also stated that "[t]he Display is not essential to the use, purpose, operation, or sale of the [SwarBali] Collection."[56] In fact, not all bracelets were sold with display units.[57] Given Design-A-Way's admission that Center Court had a variety of alternative displays and that the display is not essential to the sale of products, it is my opinion that revenues from Cliques bracelet sales should not be included in disgorgement damages based on Design-A-Way's trade dress infringement allegations in this case.

---

[51] Conversation with Steve Smous.
[52] For example, see the Complaint, pp. 8-10.
[53] Complaint, p. 9. See also, the Affidavit of Anna Verbsky Sagami, paragraph 45.
[54] For example, see CC 00042, and conversation with Steve Smous.
[55] Conversation with Steve Smous.
[56] Complaint, p. 9. See also, the Affidavit of Anna Verbsky Sagami, paragraph 47.
[57] For example, see Plaintiffs' Disclosure, p. 2. Design-A-Way did not quantify what percentage of the accused Cliques bracelets were sold accompanied by display units.

Confidential—Attorneys' Eyes Only                    15

27.   Figure 5 shows Center Court's incremental profits related to sales of all displays. Center Court sold 1,852 display units at a price of $15.00 for total gross revenues of $27,780.[58] The display units were off-the-shelf picture frames purchased from Hobby Lobby at a cost of $10.00 each.[59]   Center Court also paid commissions to sales representative of at least 15 percent ($2.25 per unit).  Deducting the cost of goods sold (purchase price) and sales commissions from gross revenues yields incremental profit of $2.75 per unit, totaling $5,093 for the 1,852 units. But again, Center Court could have sold (and did sell) the purple-frame display in place of the accused cream colored display, making this calculation an upper bound.

**Conclusion**

28.   In summary, it is my opinion that lost profits are not appropriate for lost bracelet or display sales, lost convoyed sales, price erosion, lost derivative sales, lost derivative convoyed sales, or lost future sales.  I have not seen any analyses that would establish that Design-A-Way's alleged losses actually occurred or that they would be attributable, in part or in whole, to the alleged copyright and trade dress infringement in this matter.  Design-A-Way has merely assumed lost sales without support.  Plaintiffs have provided no analysis of the market for the accused products, competitors in this market, Design-A-Way's capacity, and have not provided an accurate and supported calculation of its alleged lost profits.

29.   It is my opinion that if Design-A-Way is entitled to disgorgement of Center Court's profits based on its trade dress infringement allegations, then only profits related to sales of displays would be appropriate as damages.  After deduction of Center Court's costs, its profits

---

[58] Plaintiffs' Disclosure, p. 2, citing RS000205 to RS003558.
[59] For example, see RS00015.

on all displays total $5,093.  But, Center Court could have sold, and did sell, other (purple) frames in place of the accused displays.

30.   If Design-A-Way is entitled to disgorgement of Center Court's profits based on its copyright infringement allegations toward Cliques bracelets, then Center Court's profits after deductions for Cliques bracelets costs total $163,475.  But, Center Court could have sold, and did sell, other bracelets in place of the accused bracelets.

**Figure 1**
**Summary of Center Court's Profits**

**Copyright Infringement**

|  | Center Court's Profits |
|---|---|
| Cliques Bracelets[1] | $163,475 |

**Trade Dress Infringement**

|  | Center Court's Profits |
|---|---|
| Displays[2] | $5,093 |

1  See Figure 4.
2  See Figure 5.

Confidential - Attorneys' Eyes Only

**Figure 2**
**Center Court's Cliques Sales by Item and Sales Representative**

| | Revenue Sold Through: | | | | |
|---|---|---|---|---|---|
| | Terry Roseberry | | Other Sales Rep | | |
| Item | Palmer[1] | Not Palmer[2] | Palmer[3] | Not Palmer[4] | No Sales Rep[5] |
| CLQ-01 | $19,404 | $2,762 | $11,216 | $10,758 | $130 |
| CLQ-02 | $19,906 | $2,862 | $10,713 | $10,922 | $136 |
| CLQ-03 | $18,540 | $2,605 | $10,060 | $10,356 | $130 |
| CLQ-04 | $16,893 | $2,592 | $8,425 | $9,288 | $103 |
| CLQ-05 | $18,739 | $2,543 | $10,040 | $10,296 | $103 |
| CLQ-06 | $18,599 | $2,570 | $9,456 | $9,675 | $103 |
| CLQ-07 | $18,966 | $2,746 | $9,700 | $10,382 | $103 |
| CLQ-08 | $18,442 | $3,045 | $9,338 | $9,694 | $103 |
| CLQ-09 | $17,389 | $2,524 | $8,490 | $9,824 | $136 |
| CLQ-10 | $18,550 | $2,645 | $10,271 | $9,765 | $103 |
| CLQ-11 | $19,134 | $3,129 | $10,687 | $10,157 | $136 |
| CLQ-12 | $17,908 | $2,640 | $9,666 | $9,716 | $103 |
| | $222,469 | $32,663 | $118,061 | $120,835 | $1,393 |
| | | | | Total | $495,422 |

| | Units Sold Through:[6] | | | | |
|---|---|---|---|---|---|
| | Terry Roseberry | | Other Sales Rep | | |
| Item | Palmer | Not Palmer | Palmer | Not Palmer | No Sales Rep |
| CLQ-01 | 3,598 | 686 | 1,884 | 1,808 | 22 |
| CLQ-02 | 3,688 | 707 | 1,818 | 1,853 | 23 |
| CLQ-03 | 3,438 | 647 | 1,705 | 1,756 | 22 |
| CLQ-04 | 3,131 | 644 | 1,422 | 1,568 | 17 |
| CLQ-05 | 3,481 | 635 | 1,699 | 1,743 | 18 |
| CLQ-06 | 3,449 | 638 | 1,601 | 1,637 | 18 |
| CLQ-07 | 3,517 | 683 | 1,637 | 1,752 | 17 |
| CLQ-08 | 3,417 | 761 | 1,579 | 1,639 | 17 |
| CLQ-09 | 3,222 | 632 | 1,426 | 1,651 | 23 |
| CLQ-10 | 3,440 | 656 | 1,744 | 1,659 | 18 |
| CLQ-11 | 3,549 | 779 | 1,810 | 1,720 | 23 |
| CLQ-12 | 3,321 | 659 | 1,638 | 1,647 | 18 |
| | 41,251 | 8,127 | 19,963 | 20,433 | 236 |
| | | | | Total | 90,010 |

1  See Clq's- TerryPalmer Only.xls.
2  See Clq's- TerryNonPalmer.xls.
3  See Clq's- Palmer Only.xls and Clq's- TerryPalmer Only.xls.
4  See Clq's.xls, Clq's- Palmer Only.xls, and Clq's- TerryPalmer Only.xls
5  See Clique Sales Spreadsheet.xls. Includes all sales not included in footnotes 1 through 4.  I understand
that even sales listed as "No sales rep" would have been assigned to Terry Roseberry for commissions.
However, I have not applied any sales commissions to these sales to be conservative.
6  Clq's- TerryPalmer Only.xls, Clq's- TerryNonPalmer.xls, and Clique Sales Spreadsheet.xls include units
data.  Other Sales Rep and No Sales Rep units are calculated by dividing corresponding revenues by average
sales price after deducting Terry Roseberry revenues and units.

Confidential - Attorneys' Eyes Only

**Figure 3**
**Deductions to Calculate Center Court's Incremental Profits**

| Incremental Expenses (All) | Per Unit Cost |
|---|---|
| Beads and Stringing[1] | $2.50 |
| Magnetic Clasps[2] | $0.14 |
| Barcodes[3] | $0.011 |
| Bags[4] | $0.015 |
| **(Terry Roseberry, Palmer)[5]** | |
| Sales Commission (12% & 3%) | 15% |
| **(Terry Roseberry, Not Palmer)[5]** | |
| Sales Commission (15%) | 15% |
| **(Other Sales Rep, Palmer)[5]** | |
| Sales Commission (15% & 3%) | 18% |
| Sales Rep. Manager (6%) | 6% |
| **(Other Sales Rep, Not Palmer)[5]** | |
| Sales Commission (15%) | 15% |
| Sales Rep. Manager (6%) | 6% |

| | Incremental Expense:[6] | | | | |
|---|---|---|---|---|---|
| | **Terry Roseberry** | | **Other Sales Rep** | | |
| **Item** | **Palmer** | **Not Palmer** | **Palmer** | **Not Palmer** | **No Sales Rep** |
| CLQ-01 | $12,503 | $2,243 | $7,715 | $7,079 | $59 |
| CLQ-02 | $12,818 | $2,314 | $7,418 | $7,234 | $61 |
| CLQ-03 | $11,947 | $2,116 | $6,960 | $6,856 | $59 |
| CLQ-04 | $10,881 | $2,106 | $5,813 | $6,131 | $45 |
| CLQ-05 | $12,091 | $2,074 | $6,939 | $6,809 | $48 |
| CLQ-06 | $11,985 | $2,086 | $6,538 | $6,396 | $48 |
| CLQ-07 | $12,221 | $2,233 | $6,692 | $6,851 | $45 |
| CLQ-08 | $11,876 | $2,486 | $6,451 | $6,405 | $45 |
| CLQ-09 | $11,198 | $2,064 | $5,839 | $6,465 | $61 |
| CLQ-10 | $11,954 | $2,146 | $7,115 | $6,474 | $48 |
| CLQ-11 | $12,332 | $2,546 | $7,390 | $6,719 | $61 |
| CLQ-12 | $11,540 | $2,153 | $6,687 | $6,431 | $48 |
| | $143,346 | $26,566 | $81,556 | $79,850 | $629 |
| | | | | Total | $331,947 |

1 For examples, see RS00016 to RS00026
2 For examples, see RS00056 to RS00058
3 For example, see CC 00049.
4 For example, see CC 00048.
5 For examples, see CC 00001 to CC 00007, CC 00009 to CC 00027, and conversation with Steve Smous.
6 Equals the sum of the Per Unit Costs multiplied by Units from Figure 2, plus the corresponding commission percentage multiplied by Revenue from Figure 2.

Confidential - Attorneys' Eyes Only

**Figure 4**
**Calculation of Center Court's Incremental Profits on Cliques Bracelets**

| Item | Incremental Profit:[1] | | | | |
|---|---|---|---|---|---|
| | Terry Roseberry | | Other Sales Rep | | |
| | Palmer | Not Palmer | Palmer | Not Palmer | No Sales Rep |
| CLQ-01 | $6,901 | $519 | $3,501 | $3,678 | $72 |
| CLQ-02 | $7,088 | $548 | $3,295 | $3,689 | $75 |
| CLQ-03 | $6,593 | $490 | $3,100 | $3,500 | $72 |
| CLQ-04 | $6,011 | $486 | $2,612 | $3,157 | $58 |
| CLQ-05 | $6,648 | $469 | $3,100 | $3,487 | $56 |
| CLQ-06 | $6,614 | $484 | $2,919 | $3,279 | $56 |
| CLQ-07 | $6,745 | $513 | $3,007 | $3,531 | $58 |
| CLQ-08 | $6,566 | $560 | $2,887 | $3,289 | $58 |
| CLQ-09 | $6,191 | $461 | $2,651 | $3,360 | $75 |
| CLQ-10 | $6,597 | $499 | $3,156 | $3,292 | $56 |
| CLQ-11 | $6,802 | $583 | $3,296 | $3,439 | $75 |
| CLQ-12 | $6,368 | $487 | $2,979 | $3,285 | $56 |
| | $79,124 | $6,097 | $36,505 | $40,986 | $764 |
| | | | | Total | $163,475 |

1 Equals Revenue from Figure 2 minus Incremental Expense from Figure 3.

Confidential - Attorneys' Eyes Only

**Figure 5**
**Calculation of Center Court's Incremental Profits on Cliques Displays**

| | | |
|---|---|---|
| Price[1] | | $15.00 |
| **Minus Expenses** | | |
| COGS[2] | | $10.00 |
| Sales Commission (15%)[3] | | $2.25 |
| **Incremental Profit** | | |
| Per Unit | | $2.75 |
| Units[4] | X | 1,852 |
| | | |
| **Total Display Profit** | | $5,093 |

1  For example, see Plaintiffs' Disclosure, p. 2.
2  For example, see RS00015.
3  For examples, see CC 00001 to CC 00007, CC 00009 to CC 00027, and
conversation with Steve Smous.
4  For example, see Plaintiffs' Disclosure, p. 2.

**Appendix A**
**Jeffrey J. Cordray**

RESUME

January 2011

**Address:**

Laurits R. Christensen Associates, Inc.
800 University Bay Drive, Suite 400
Madison, WI 53705-2299
Telephone: 608.231.2266
Fax: 608.231.2108
Email: jeff@LRCA.com

**Academic Background:**

M.A., University of Alabama, 1995, Economics
Accepted into PhD Program
B.S., Bemidji State University-Minnesota, 1993, Economics
Graduated Cum Laude, Awarded Outstanding Research in Economics,
Academic All-Conference in Hockey

**Positions Held:**

Vice President, Laurits R. Christensen Associates, Inc., 2006-Present
Senior Economist, Laurits R. Christensen Associates, Inc., 1999-2005
Economist, Laurits R. Christensen Associates, Inc., 1998
Staff Economist, Laurits R. Christensen Associates, Inc., 1995-1997
Consultant/Intern, ReliaStar, Minneapolis, MN, 1995
Micro Economics Teacher, University of Alabama, Tuscaloosa, AL 1994

**Professional Experience:**

Provide economic analysis in a number of litigation contexts including antitrust, breach of contract, patent infringement, trademark infringement, and lost wages related cases. Duties include development of damage analysis, management of staff, regression and other statistical analysis, deposition and trial support and testimony, and preparation of exhibits. I have testified at trial in breach of contract, medical malpractice, and trademark cases. I also have considerable experience consulting for the United States Postal Service.

**Appendix B**

**Deposition and Trial Testimony of Jeffrey J. Cordray for the Preceding Four Years**

| Date | Case Name | Client | Firm | Court |
|---|---|---|---|---|
| 2011 | Hy Cite Corporation v. Regal Ware, Inc., et al. | Regal Ware, Inc. | Whyte Hirschboeck Dudek S.C. | U.S. District Court, Western District of Wisconsin |
| 2010 | Hydro-Thermal Corporation v. Pro-Sonix, LLC et al. | Pro-Sonix, LLC et al. | Petrie & Stocking | U.S. District Court, Eastern District of Wisconsin |
| 2010 | Sara Simonson et al v. Morbark Industries Inc | Morbark, Industries Inc. | Godfrey & Kahn | Wisconsin Circuit Court, Jackson County |
| 2010 | Truck Equipment Inc. v. Stoughton Trailers LLC | Stoughton Trailers | Davis & Kuelthau | Wisconsin Circuit Court, Brown County |
| 2009 | Cranberries Limited, Inc. v. Holly Ranch Cranberries, Inc. | Holly Ranch Cranberries, Inc. | Quarles & Brady | Wisconsin Circuit Court, Wood County |
| 2009 | Lambo v. Greenberg, et al. | Lambo | Aiken & Scoptur | Wisconsin Circuit Court, Milwaukee County |
| 2009 | Racine Harley-Davidson v. Harley-Davidson Motor Company | Racine Harley-Davidson | Boardman Law Firm | Wisconsin Circuit Court, Racine County |
| 2009 | Amanda J. Herrmann, et al. v. Morbark, Inc., et al. | Morbark, Inc. | Godfrey & Kahn | Wisconsin Circuit Court, Kenosha County |
| 2008 | VDP Patent, LLC v. Welch Allyn Holdings, Inc., et al. | VDP Patent, LLC | Cahill Gordon & Reindel | U.S. District Court, Southern District of New York |
| 2008 | Superior Seafoods, Inc., et al. v. Tyson Foods, Inc., et al. | Superior Seafoods, Inc., et al. | Cox Goudy McNulty & Wallace | U.S. District Court, District of Minnesota |
| 2008 | Ashley Furniture Industries, Inc. v. Lifestyle Enterprises, Inc. | Ashley Furniture Industries, Inc. | Patterson, Thuente, Skaar & Christensen | U.S. District Court, Western District of Wisconsin |
| 2007 | Steve Germano v. The Vollrath Company | Steve Germano | Edwards Law Office | Arbitration, Milwaukee, Wisconsin |

Appendix C

Stipulated Protective Order
Complaint
Answer to Complaint of Center Court Direct, Inc.
Answer to Complaint of Palmer Marketing Ent, LLC
Letter with Sagami's and Design-A-Way Publication LLC's Disclosure and Itemization of Damages
Affidavit of Anna Verbsky Sagami
Answers and Responses of Center Court Direct, Inc. to Plaintiffs' First Set of Discovery Requests
Response of Palmer Marketing Ent, LLC to Plaintiffs' First Set of Discovery Requests
Plaintiffs' Answers and Responses to Center Court Direct's First Set of Interrogs & Requests for Production
Joint Preliminary Pre-Trial Conference Report
Stipulation Regarding Entry of Preliminary Injunction Against Defendant Center Court Direct, Inc.
Clique Sales Spreadsheet.xls with Correspondence
June2009CenterCourtCommissions.xls
July2009CenterCourtCommissions.xls
Aug2009CenterCourtCommissions.xls
Sept2009CenterCourtCommissions.xls
Oct2009CenterCourtCommissions.xls
Nov2009CenterCourtCommissions.xls
Dec2009CenterCourtCommissions.xls
Clq's.xls
Clq's - 1-6 Only.xls
Clq's - 1-8 Only.xls
Clq's- Palmer Only.xls
Clq's- TerryPalmer Only.xls
Clq's- TerryNonPalmer.xls

| Beginning Bates | Ending Bates |
| --- | --- |
| CC 00001 | CC 00065 |
| RS000002 | RS000013 |
| RS000015 | RS000058 |
| RS000060 | RS000060 |
| RS000063 | RS000087 |
| RS000089 | RS000154 |
| RS000156 | RS000174 |
| RS000200 | RS000200 |
| RS000202 | RS000202 |
| RS000205 | RS004769 |
| Sagami 0001 | Sagami 1008 |